Lewis B. Maytag v. Commissioner.
Maytag v. Commissioner
Docket No. 18252.
United States Tax Court
1950 Tax Ct. Memo LEXIS 239; 9 T.C.M. (CCH) 240; T.C.M. (RIA) 50072; March 24, 1950
*239 Ralph L. Read, Esq., and William A. McDonald, C.P.A., 417 Continental Oil Bldg., Denver, Colo., for the petitioner. William Schwerdtfeger, Esq., for the respondent. MURDOCK Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in the gift tax of the petitioner for 1944 in the amount of $185,492.96. The values of gifts of no-par common stock on March 8, 1944 and of $3 cumulative preference stock on March 16, 1944 of The Maytag Company are the only matters in dispute. Findings of Fact The petitioner filed his gift tax return for 1944 with the collector of internal revenue for the district of Colorado. The petitioner created four trusts, one for the benefit of each of his four children, on March 8, 1944. He transferred to each trust on the same day 25,000 shares of the no-par common stock of the company. He transferred to each trust 10,000 shares of the $3 cumulative preference stock of the company on March 16, 1944. All of those transfers were made as gifts. The Maytag Company (herein called the company) and its predcessor have been in business since 1893. The outstanding capital stock of the company in late May 1928 consisted *240 of (1) 100,000 shares of $6 first preferred stock, (2) 320,000 shares of $3 preference stock and (3) 1,600,000 shares of no-par common stock. The $6 first preferred dividend was cumulative and was payable before any dividends could be paid on the cumulative preference stock. The first preferred stock carried liquidation rights of $100 per share plus accrued dividends in an involuntary liquidation and of $110 per share plus accrued dividends in a voluntary liquidation. It was callable on 30 to 60 days notice at $110 per share plus accrued dividends. A sinking fund was established to redeem 2 per cent of the first preferred stock annually, provided the dividends on both classes of preferred stock were paid to date. The sinking fund requirements were cumulative and had to be met to date before dividends could be paid on the common stock. The $3 cumulative preference dividend was payable before any dividends could be paid on the common stock. The preference stock carried liquidation rights of 90 per cent of the distributable assets after redemption of the first preferred stock, but not to exceed $50 per share plus accrued dividends in an involuntary liquidation or $55 per share plus *241 accrued dividends in a voluntary liquidation. It was callable on 30 to 60 days notice at $55 per share plus accrued dividends, provided the dividends on the first preferred stock were not in arrears. Each share of the preference stock carried an attached Common Stock Purchase Warrant entitling the holder to purchase 1 1/2 shares of common stock on or before May 1, 1938. One-half of the monies received by the company upon the exercise of those warrants was payable into a sinking fund for the redemption of the preference stock. Neither the first preferred nor the cumulative preference stock carried voting rights except (a) on certain matters relating to capitalization, creation of funded debt, etc., and (b) in the event of default of four quarterly dividends on either class of preferred stock, in which event the first preferred and cumulative preference stockholders, voting together as a class, would be entitled to elect a majority of the Board of Directors. The company had only one class of common stock outstanding. The common stock was of no par value, it had exclusive voting rights except as noted above, and it was entitled to all dividends after the payment of first preferred and *242 preference dividends and to all assets upon dissolution after the satisfaction of the liquidation rights of the preferred and preference stockholders. There were no bonds outstanding. The company originally manufactured band cutters, self feeders and corn huskers. It began manufacturing electric washing machines in 1911 and was one of the pioneers in the manufacture of that type of machine. It was the first to market gasoline-driven washing machines, cast aluminum tubs and one of the first to market washing machines with swinging wringers. Its sales of washing machines exceeded those of all other products by 1919. The company and its subsidiaries were engaged primarily in the manufacture and sale of washing machines and ironing machines and repair parts therefor from 1922 through 1941. The company developed a new type of washing machine in 1922 which consisted of a circular tub in the bottom of which a cone-shaped impeller with blades oscillated in such a manner that the soapy water was given a circulatory motion in the tub. The company concentrated its activities on the manufacture and sale of that type of washing machine after 1922. It was the largest exclusive manufacturer *243 of washing machines in the world by 1928 and continued to be a leader in the field until the war terminated the manufacture of all washing machines. Its products were sold in 1928 through approximately 2,000 exclusive dealers and by about 1,600 other dealers. Its daily productive capacity was 400 machines in 1924, 800 in 1928 and 2,000 in 1929. The company sold about one-third of all washing machines sold in 1929 and about one-sixth of those sold in 1933 and 1934. A competitor of the company developed and produced a fully automatic washing machine after 1938. The company considered developing such a machine prior to the war, but it did not develop one until after the war. The company was engaged primarily in manufacturing airplane parts and other war material under war sub-contracts from April 1942 until August 1945, although it continued to make washing machine replacement parts which accounted for 10 to 12 per cent of its billing during that period. Its competitors were also engaged in war work during those years. The net profits of the company, the amounts required to pay the current dividends on the two classes of its preferred stock, the earnings per share of common stock, *244 and the dividends paid per share of each class of stock were as follows from 1925 through 1944: Dividend
Per Share
Paid 1st
Paid Cum.
Paid
Preferred
Earnings
Dividend
Dividend
Dividend
Year
Net Profit [1]
Requirement [2]
of Common [2]
Preferred
Preference
Common
1925
$4,377,153
$2.75
$ .50
1926
6,823,491
4.26
None Outstanding
2.00
1927
6,153,933
3.85
3.00
1928
5,336,710
$ 756,333
2.85
$3.00
$1.50
2.37 1/2
1929
6,838,885
1,448,101
3.33
6.00
3.00
2.00
1930
2,030,303
1,328,762
.43
6.00
3.00
1.00
1931
1,013,291
1,270,746
6.00
3.00
1932
100,773
1,212,743
3.00
.75
1933
1,204,503
1,212,030
1.50
1934
1,960,836
1,212,027
.46
[3] 13.50
1.50
1935
2,581,096
1,212,027
.85
6.00
[4] 7.50
1936
2,816,900
1,148,879
1.03
6.00
[5] 5.25
.50
1937
2,292,706
1,083,725
.747
6.00
3.00
.50
1938
682,967
1,081,380
6.00
3.00
1939
1,416,020
1,046,160
.228
6.00
3.00
1940
1,797,994
1,030,995
.474
6.00
3.00
.15
1941
1,615,307
1,017,414
.369
6.00
3.00
1942
701,775
990,318
6.00
2.00
1943
1,230,004
990,318
.148
6.00
2.00
1944
1,384,205
990,318
.243
6.00
3.00
*245 The company had 32,210 shares of first preferred, 265,686 shares of cumulative preference, and 1,617,921 shares of no-par common stock outstanding on March 8 and March 16, 1944. The outstanding cumulative preference and no-par common stock of the company was owned on those dates as follows: March
March
8, 1944
16, 1944
Shares Cumulative Pref-
erence Owned by: Petitioner and family
66,893
60,100
Brother, sisters and fami-
lies
20,453
20,453
87,346
80,553
Public
178,340
185,133
Shares Common Owned
by: Petitioner and family
174,543
174,543
Brother, sisters and fami-
lies
841,417
841,417
1,015,960
1,015,960
Public
601,961
601,961 The company had assets of $11,822,925 and a net worth of $9,499,698 as of December 31, 1943. It had assets of $12,379,881 and a net worth of $9,593,861 as of December 31, 1944. *246 The stock of the company have been listed on the New York Stock Exchange continuously since prior to 1940. The following table shows the no-par common and cumulative preference stocks of the company sold through the Exchange by the petitioner and others, and quotations on the Exchange from 1939 through 1944: Common
Cumulative Preference
Shares Sold
Shares Sold
Period
Total
Petr.
Low
High
Close
Total
Petr.
Low
High
Close
1939
50,600
3 1/2
6 3/8
15,000
24 3/4
36 1/2
1940
26,900
2 1/4
4 1/8
7,300
20    30 1/8
1941
31,000
1    2 7/8
18,600
15 3/4
28    1942
23,700
1 1/4
3 3/8
16,800
13 7/8
22    1943
January
4,400
2 1/2
3 5/8
1,000
23    23 1/2
February
7,200
3 1/2
4 1/4
2,300
21 7/8
25 1/2
March
9,700
4    4 5/8
4,500
25 1/8
26 3/4
April
11,300
4    5 3/4
3,000
26 1/2
28 1/4
May
16,000
5 1/4
7 1/4
2,300
27 1/2
33    June
10,900
2,500
6 3/8
7 1/8
2,400
30    32 1/2
July
14,700
9,900
5    6 3/4
1,500
30    31 1/2
August
17,600
13,600
4 3/4
6    1,400
30 1/4
31    September
20,100
13,900
5 1/4
6 1/8
800
31 1/2
32 1/2
October
12,700
8,700
5    5 1/2
2,000
30 3/4
36    November
13,500
6,200
4 1/2
5 3/8
600
29    33    December
11,100
6,000
4 3/4
5 1/4
1,100
33    34 1/2
1944
January
15,900
10,600
5    5 5/8
1,400
None
34 1/4
35 1/2
February
16,400
13,400
4 5/8
5 1/8
600
None
32 3/4
34 1/2
March
1
400
100
4 5/8
4 3/4
4 3/4
None
None
2
300
300
4 3/4
4 3/4
4 3/4
None
None
3
400
300
4 3/4
4 3/4
4 3/4
None
None
4
600
500
4 5/8
4 5/8
4 5/8
None
None
6
1,300
1,200
4 1/2
4 5/8
4 1/2
None
None
7
1,600
1,600
4 1/2
4 5/8
4 5/8
None
None
8
16,100
11,200
4 1/2
5 1/4
4 7/8
400
None
35    35 1/2
35 1/2
9
3,500
None
5 3/8
5 1/2
5 3/8
100
100
34 1/2
34 1/2
34 1/2
10
2,300
None
5 3/8
5 5/8
5 5/8
300
200
32 1/2
33    33    11
1,900
None
5 3/8
5 1/2
5 3/8
500
500
32 3/4
33    33    13
2,400
None
5 1/2
5 3/4
5 3/4
600
600
32 1/2
33 1/2
32 1/2
14
3,000
None
5 3/4
5 7/8
5 3/4
2,100
2,093
33 1/8
33 1/2
33 1/2
15
2,300
None
5 7/8
6    6    1,800
1,900 *
32 1/2
33    32 3/4
16
2,800
None
6    6 1/8
6    1,900
1,400
33    34    34    17-31
12,100
None
5 1/2
6 1/8
2,100
None
33 1/4
34 3/4
9 Months
224,900
5    11 1/2
13,600
33 1/2
44    *247 The petitioner reported four gifts totaling 100,000 shares of the company's nopar common stock to the four trusts on March 8, 1944 at a total value of $390,000, and four gifts totaling 40,000 shares of the company's cumulative preference stock to the four trusts on March 16, 1944 at a total value of $1,048,000 on his gift tax return for 1944. The Commissioner determined that the value of each of four gifts of 25,000 shares of the company's no-par common stock was $121,875, or a total of $487,500, for the four gifts on March 8, 1944, and that the value of each of four gifts of 10,000 shares of the company's cumulative preference stock was $335,000, or a total of $1,340,000, for the four gifts on March 16, 1944. He explained that "These shares are included at the mean of the high and low sales prices on the New York Stock Exchange on the date of the gifts." The value of each of the four gifts of the company's common stock made by the petitioner on March 8, 1944, was $121,875, or a total value of $487,500. The value of each of the four gifts of the company's cumulative preference stock made by the petitioner on March 16, 1944, was $335,000, or a total value *248 of $1,340,000. The stipulation of facts is incorporated herein by this reference. Opinion MURDOCK, Judge: Section 1000 imposes a tax "upon the transfer during such cleandar year by any individual * * * of property by gift". Section 1005 provides that "If the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift." The petitioner in this case made four separate gifts on March 8 and four more on March 16, 1944. Each of those gifts must be valued separately for the purpose of computing the gift tax. John J. Newberry, 39 B.T.A. 1123; Lawrence C. Phipps, 43 B.T.A. 1010, affirmed 127 Fed. (2d) 214, cert. den. 317 U.S. 645; Robert L. Clause, 5 T.C. 647, affirmed 154 Fed. (2d) 655. All of the evidence submitted in this case has been carefully considered, including that relating to the history of the company, to its earnings, dividends, assets, competition and prospects, to the effect of the war, and to sales of the stock on the New York Stock Exchange on or about the critical dates, the opinions of witnesses for the petitioner, the opinions of the witnesses *249 for the respondent, the number of shares involved, market conditions, the type of stock involved, and all other relevant evidence. An effort has been made to give to each part of the evidence submitted, including the opinion evidence, the weight to which it is entitled. The arguments of counsel have all been considered. The underlying principles which this Court regards as applicable in cases like this, with due regard for differences in facts, were discussed at length in John J. Newberry and Robert L. Clause, supra, and need not be reported here. A finding has been made to the effect that the values as determined by the Commissioner were not erroneous. Decision will be entered for the respondent. Footnotes
1. Amounts of net profit are computed after allowances for federal taxes. ↩
2. Preferred dividend requirements and earnings per share of common do not reflect the requirements for any arrearages in preferred dividends. ↩
3. Includes $7.50 total arrearage. ↩
4. Includes $4.50 on arrearage. ↩
5. Includes $2.25 total arrearage.↩
*. So Stipulated.↩